*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JAYEL GAFFORD,

Plaintiff-Appellee,

v

ROBERT GAFFORD,

Defendant-Appellant.

UNPUBLISHED
October 04, 2024
8:31 AM

No. 369667
Livingston Circuit Court
Family Division
LC No. 22-057531-DM

Before: BORRELLO, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right from the parties' January 2024 judgment of divorce (JOD), entered following a three-day bench trial. The parties had one child, AG, who was born in August 2015. Defendant also had four children from a prior marriage. This appeal involves the weekly parenting-time schedule established by the court with respect to AG and the court's order that defendant pay $5,000 toward covering the cost of plaintiff's attorney fees. We affirm.

## I. FACTS

On March 2, 2023, the circuit court entered a temporary custody order. The parties were awarded joint legal custody of AG, and a two-week alternating parenting-time schedule was established. The first week, defendant was to have parenting time from 9:00 a.m. on Monday through 7:00 p.m. on Tuesday. During week two, defendant had parenting time from Wednesday at 9:00 a.m. through Thursday at 7:00 p.m., to be coordinated with his work schedule. Additionally, defendant was to have parenting time on alternating weekends from Friday at 9:00 a.m. to Sunday at 6:00 p.m. Defendant filed an objection to the parenting-time schedule, but he later withdrew it. Following the issuance of the order, plaintiff left the marital home with AG and moved in with her mother and stepfather in Tecumseh, Michigan. Plaintiff did not pay rent and was provided a vehicle to use while she remained in Tecumseh. She intended to live with her mother and stepfather until she could find her own housing in Tecumseh.

At trial, defendant requested that a new parenting-time schedule be implemented, one that provided equal parenting time for the parties throughout the year. He testified that the schedule set forth in the temporary custody order did not mirror the amount of time he spent with AG during

-1-

the course of the marriage. He proposed the following schedule be established during the months AG is in school: Monday through Friday night with defendant, and Friday night through Sunday night with plaintiff. Defendant proposed to "even out the parenting time" during the summer. Plaintiff did not think that AG would fare well under defendant's proposed schedule. She believed the existing parenting-time schedule was in AG's best interests because it was consistent with the way things were during the marriage. Indeed, she believed the existing schedule had actually improved defendant's relationship with AG because defendant's one-on-one time with AG had increased.

In an opinion and order issued in December 2023, the circuit court determined that an established custodial environment existed only with plaintiff. The court stated it was clear that plaintiff "was almost exclusively responsible for providing the care, guidance, and daily needs of" AG during the marriage. The court cited plaintiff's testimony that she was the primary caregiver for AG and his four siblings. The court also recognized plaintiff's testimony about preparing meals for the children, assisting AG's siblings with their homework, and putting AG to bed at night. The court stated it was able to determine from the trial evidence and its "observations of the parties during testimony" that AG looked to plaintiff for guidance, love, security, and life's necessities. Accordingly, the court explained that defendant would have to establish by clear and convincing evidence that any change he proposed to the parenting-time schedule that affected the established custodial environment was in AG's best interests.

The court concluded that defendant had not met his burden of proof. The court stated that defendant had proposed a significant expansion of his parenting time that would alter the established custodial environment. The court discussed the 12 best-interest factors, MCL 722.23, and concluded that plaintiff was favored on two (factors (b) and (h)), she was slightly favored on two (factors (a) and (d)), and the parties were equal with respect to five (factors (c), (e), (f), (g), and (j)). The court also concluded AG was too young to express a preference (factor (i)), there was no evidence of domestic violence (factor (k)), and there were no other factors relevant to the custody dispute (factor (l)).

## II. PARENTING TIME

Consistent with the principle of promoting a child's best interests, MCL 722.25(1), and with the goal of expeditiously resolving a child custody dispute, MCL 722.28, all "[o]rders concerning parenting time must be affirmed on appeal unless the trial court's findings were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue," *Pickering v Pickering*, 268 Mich App 1, 5; 706 NW2d 835 (2005). "Under the great weight of the evidence standard, this Court should not substitute its judgment on questions of fact unless the facts clearly preponderate in the opposite direction." *Shade v Wright*, 291 Mich App 17, 21; 805 NW2d 1 (2010). Deference is given to the trial court's credibility determinations. *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2005). "An abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Id*. A trial court commits a clear legal error when it "incorrectly chooses, interprets, or applies the law . . . ." *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994).

## A.  ESTABLISHED CUSTODIAL ENVIRONMENT

Defendant asserts that the circuit court erred by concluding that an established custodial environment existed only with plaintiff and that as a result he was required to establish by clear and convincing evidence that the parenting-time schedule he was seeking was in AG's best interests.  His argument is two-fold.  First, he argues that as in *Bofysil v Bofysil*, 332 Mich App 232; 956 NW2d 544 (2020), the court improperly favored plaintiff over him on the basis that she was the stay-at-home parent while he was working full-time outside the home.  Defendant maintains that as in *Bofysil*, the overwhelming evidence presented was that he was a good father who could attend to AG's needs.  Second, defendant argues that the circuit court's conclusion that the established custodial environment existed solely with plaintiff was in large part improperly based on the temporary custody order.  He asserts that the fact that a temporary order exists cannot create a custodial relationship.

Plaintiff argues in response that the circuit court did not rely on the temporary order when rendering a decision.  Rather, she states, the court relied on the documents filed and the extensive testimony provided.  Plaintiff asserts the circuit court did not penalize defendant for working outside the home.  Moreover, plaintiff asserts that defendant's involvement in AG's life is considerably different from the working parent in *Bofysil*, who arranged her work schedule to maximize her involvement with the minor child during the child's waking hours.  Conversely, plaintiff maintains that despite defendant's seniority and flexible work schedule, he established a work schedule that kept him away from AG while the child was awake.  She acknowledges that defendant was involved with AG when defendant was home, but maintains that his involvement is not equivalent to hers because of defendant's work and court schedules, as well as his commitments to AG's four siblings.  She argues that the evidence was more than enough to show that an established custodial environment existed only with her.

An established custodial environment exists where the evidence shows that a "child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort."  MCL 722.27(1)(c).  The same provision forbids a court from modifying or amending "its previous judgments or orders or issu[ing] a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child."  "[W]hen there is an established custodial environment with both parents, neither parent's established custodial environment may be disrupted except on a showing, by clear and convincing evidence, that such a disruption is in the children's best interests."  *Kuebler v Kuebler*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362488); slip op at 17 (quotation marks and citation omitted).  In determining whether to modify or amend, "it is the child's standpoint, rather than that of the parents, that is controlling." *Pierron v Pierron*, 486 Mich 81, 92; 782 NW2d 480 (2010).

Defendant's argument relies extensively on an analogy that he draws between his circumstances and the circumstances of the working parent in *Bofysil*.  At issue in *Bofysil*, 332 Mich App at 236, was the trial court's custody award.  The parties in *Bofysil* married in April 2014 and divorced a little over four years later.  *Id.* at 236-237.  During the marriage they decided to have a child by implanting in the defendant her egg that had been fertilized by a sperm donor.  *Id.* at 236.  The parties' daughter, AB, was born in January 2016.  *Id.* at 237.  The parties agreed that for a time the plaintiff would continue to work full-time outside the home and the defendant would

leave her employment and stay home to care for AB. *Id*. at 236-237. The court awarded the defendant sole legal custody and physical custody. *Id*. at 239.

The trial "court determined that AB had an established custodial environment exclusively with" the defendant. *Id*. at 243. On appeal by right, this Court concluded that the evidence presented at trial preponderated against the trial court's established-custodial-environment finding, reasoning:

> Both parties agreed that from AB's January 2016 birth until [the defendant] left the home with AB in the middle of June 2018, both parents shared in the care of AB. Although [the plaintiff] worked outside of the home, she arranged her schedule to maximize her time home during AB's waking hours. Even [the defendant] conceded that [the plaintiff] was usually the one to make lunch for the family and that the whole family often would be present when [the plaintiff] took on side jobs training dogs. AB clearly had a homelife in which both her parents provided for her care and needs. Although AB might have looked to her parents to fulfill different needs and likely understood at some level their distinct household roles, both provided her with "security, stability, and permanence." [*Id*. at 243-244.]

*Bofysil* concluded that the trial court's established-custodial-environment determination was improperly predicated in significant part on the fact that the plaintiff worked full-time outside the home to support the family, which meant that AB was with the defendant most of the time. *Id*. at 236. *Bofysil* stated that the trial court discounted the plaintiff's role in the family and treated the plaintiff "as less than a full parent." *Id*. at 236, 244. Additionally, *Bofysil* concluded that the trial court's favoritism of the defendant affected the burden of proof and permeated the court's subsequent weighing of the best-interest factors. *Id*. at 236.

Defendant in this case alleges that the circuit court's established-custodial-environment determination was corrupted by the same inappropriate preference for the stay-at-home parent. But the analogy defendant attempts to draw between his case and *Bofysil* is unconvincing. Defendant ignores important and determinative differences between the two cases. It is clear from the circuit court's opinion that it found plaintiff's testimony about the parties' respective contributions to taking care of AG more credible. Although the circuit court did not specifically state its credibility determinations, it is clear from the court's December 20, 2023 opinion and order that it credited plaintiff's testimony over defendant's on those points where the testimonies about defendant's involvement in caring for AG were starkly different. And plaintiff described defendant's involvement on the days he worked as minimal.

In *Bofysil*, the parties agreed that the plaintiff "arranged her schedule to maximize time home during AB's waking hours," during which the plaintiff would be involved in caring for AB. *Id*. at 243-244. In this case, although defendant testified he would be willing in the future to use his accumulated personal and annual leave to lessen the hours he was away from AG, there is no evidence that he regularly, or even sporadically, did so during the course of the marriage. The *Bofysil* defendant testified that when the plaintiff awoke, " 'we would spend some family time together.' " *Id*. at 237-238. In this case, however, defendant stated he typically left home just before 6:00 a.m., a time when AG was still sleeping. Moreover, the *Bofysil* plaintiff typically made lunch for the family. *Id*. at 238. But in this case, the testimony established that plaintiff was

responsible for preparing family meals, including packing lunches for the children to take to school. Defendant relies on the fact that his work schedule allowed him to be home often during the course of the week, but there is no evidence in the record that his involvement in caring for AG was markedly different than when defendant was working.

Additionally, the trial court in *Bofysil* cited the fact that the defendant had primary physical custody of AB since the parties separated and how that had impacted AB. *Id*. at 239. The court stated that the child " 'naturally looks currently to the parent she is with for love, affection and the necessities of life,' " which the majority of the time was the defendant. *Id*. Defendant in the case at hand argues that the circuit court similarly gave disproportionate weight to the temporary custody order. This is not borne out by the record. The court's December 2023 opinion and order shows that the circuit court's conclusion was based on the circumstances of AG's life before plaintiff and defendant separated. The court stated that the record clearly established "that *during the course of the marriage*," plaintiff was the primary caregiver. (Emphasis added.) After detailing the operative facts of AG's care during the marriage, and citing the court's position to observe and assess the parties as they were testifying, the court reiterated that AG looks to plaintiff "for love[,] guidance, security, and the necessities of life." The court did reference the parenting-time schedule established by the temporary custody order, but it did so only as a frame of reference to defendant's proposed parenting-time schedule. The reference had nothing to do with the court's determination of AG's established custodial environment.[1]

---

[1] Although not cited by the parties, we note that in *Sabatine v Sabatine*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 165279), our Supreme Court explained that a child's preseparation custodial environment can be extinguished by the conditions of the child's postseparation environment. *Id*. at ___; slip op at 7-10. *Sabatine* held that "where the preseparation custodial environment no longer exists, the relevant point in time for purposes of determining whether an established custodial environment exists is at the time the trial court makes its custody determination." *Id*. at ___; slip op at 7-8. Accordingly, *Sabatine* instructed that "[t]he preseparation circumstances are only relevant to the extent that they continue to exist or are probative of whether a new established custodial environment exists at the time the trial court is rendering its decision." *Id*. at ___; slip op at 10.

However, defendant does not discuss if or how the conditions of the postseparation environment, including the parenting-time schedule established by the circuit court's temporary custody order, impacted the preseparation established custodial environment; nor does he argue that the trial court should have made its custodial-environment determination on the basis of the circumstances that existed following entry of the temporary custody order. In any event, even if the postseparation conditions established custodial environments with both parties, defendant would still have to prove by clear and convincing evidence that his proposed parenting-time schedule was in AG's best interests because it would have significantly altered plaintiff's custodial environment as it existed under the temporary custody order. *Kuebler*, ___ Mich App at ___; slip op at 17.

## B. BEST-INTEREST FACTORS (D) AND (E)

Citing *Wiechmann v Wiechmann*, 212 Mich App 436; 538 NW2d 57 (1995), defendant also argues that the circuit court failed to consider AG's strong bond with his four siblings when considering best-interest factors (d) and (e), which address, respectively, maintaining a stable environment and the permanence of the family home. Plaintiff argues the circuit court properly weighed the best-interest factors, including factors (d) and (e). She rejects the contention that the court did not consider AG's four siblings, as evidenced by the fact that AG spends more time with them under the court's parenting-time schedule than he would have under defendant's proposed schedule.

MCL 722.23(d) considers "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity," and (e) considers "[t]he permanence, as a family unit, of the existing or proposed custodial home or homes." While there is a "degree of overlap between" these factors, factor (e) is focused on a "child's prospects for a stable family environment." *Ireland v Smith*, 451 Mich 457, 465; 547 NW2d 686 (1996).

The circuit court found that plaintiff was slightly favored on factor (d) and the parties were equal on factor (e). The court set down relevant evidence regarding each factor. Regarding factor (d) the court concluded:

> There was no dispute that during the marriage [defendant] would leave for work before the minor child would wake up and would return from work when the minor child was either getting ready for bed or already asleep. This raises serious concerns for the Court about [defendant's] ability to provide consistent care for the minor child. The Court did not find [defendant's] testimony to be persuasive regarding [plaintiff] having an unstable home environment for the minor child.

As to factor (e), the court cited where the parties were currently living, who resided in the home with them, and the fact that neither party had introduced other romantic partners into AG's life. The court's side-by-side comparison of the same elements of the parties' home environments, coupled with the fact the court made no mention of one living environment being better than the other, implies the court's conclusion that neither party was favored on factor (e).

We believe it is clear from the circuit court's December 2023 opinion and order that the court was conscious of AG's relationship with his siblings, as the court mentions the siblings throughout the opinion and order. Moreover, neither the Child Custody Act, MCL 722.21 *et seq.*, nor MCR 2.517(A)(2)[2] " 'requires in cases involving child custody decisions that the court comment upon every matter in evidence or declare acceptance or rejection of every proposition argued.' " *Fletcher*, 447 Mich at 883, quoting *Baker v Baker*, 411 Mich 567, 583; 309 NW2d 532 (1981).

---

[2] In a bench trial, "[b]rief, definite, and pertinent findings and conclusions on the contested matters are sufficient, without over elaboration of detail or particularization of facts." MCR 2.517(A)(2).

Defendant's reliance on *Wiechmann*, 212 Mich App 436, is unavailing. The divorcing parties in that case were the parents of four children. *Id*. at 437. The Friend of the Court recommended that the defendant-mother be given custody of all four. *Id*. at 437-438. However, the trial court awarded custody of the two younger children to the defendant-mother and the two older children to the plaintiff-father. *Id*. at 438. The defendant-mother challenged the division of custody on appeal. *Id*. at 437.

In this case, defendant quotes the following from *Wiechmann*: "This Court appreciates the importance of attempting to keep siblings together. The sibling bond and the potentially detrimental effects of physically severing that bond should be seriously considered in custody cases . . . ." *Id*. at 439-440. In *Wiechmann*, this Court stated that even though maintaining a sibling bond is not listed as a separate best-interest factor, such a bond does impact other listed factors, including factors (d) and (e). *Id*. at 440 n 2.

What defendant has failed to cite is what the *Wiechmann* panel said after the end of the quoted portion he has presented:

> This Court appreciates the importance of attempting to keep siblings together. The sibling bond and the potentially detrimental effects of physically severing that bond should be seriously considered in custody cases where the children likely have already experienced serious disruption in their lives as well as a sense of deep personal loss. *Ultimately, however, it is the best interests of each individual child that will control the custody decision*. "In any custody dispute, our overriding concern and the overwhelmingly predominant factor is the welfare of the child." We believe that in most cases it will be in the best interests of each child to keep brothers and sisters together. However, if keeping the children together is contrary to the best interests of an individual child, the best interests of that child will control . . . . [*Id*. at 439-440 (citations and footnote omitted; emphasis added).]

Indeed, *Wiechmann* affirmed the trial court's custody decision. *Id*. at 441.

In sum, the court's analysis of factors (d) and (e) is not clearly erroneous. Moreover, even if factors (d) and (e) were weighed differently, defendant has neither argued that it would call into doubt the circuit court's best-interest analysis nor explained how it would call into doubt the parenting-time schedule implemented. And given that defendant has all five children every other weekend, and that the evidence has showed a willingness of both parties to maintain contact with AG when he is in the other's custody, defendant has not shown, as he alleges, that the parenting-time schedule has essentially eliminated AG's ability to maintain a close relationship with four siblings.

## III. ATTORNEY FEES

"We review for an abuse of discretion a trial court's award of attorney fees in a divorce action," which occurs when the award is outside the range of principled outcomes. *Richards v Richards*, 310 Mich App 683, 699; 874 NW2d 704 (2015). We review questions of law de novo, *Myland v Myland*, 290 Mich App 691, 702; 804 NW2d 124 (2010), and factual findings made by the court for clear error, *Richards*, 310 Mich App at 700. "A finding is clearly erroneous where,

although there is evidence to support the finding, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 652; 662 NW2d 424 (2003).

Defendant argues that the circuit court erred by awarding plaintiff $5,000 in attorney fees because the award was based solely on the difference in their incomes. He asserts that the court failed to consider each party's needs and ability to pay. He asserts that plaintiff receives $2,723 per month ($32,676 per year) from her job, child support, and spousal support, but only has $800 per month in expenses, which leaves her with $1,673 in disposable income each month. Comparatively, he states that he has only $500 in disposal income left each month after meeting all of his monthly expenses.

Plaintiff responds that the award of fees was supported by the testimony and documentary evidence admitted at trial. Plaintiff asserts that defendant's income for 2023 was $97,162.70 and that he has $2,194.37 in monthly expenses. She further asserts that the evidence shows she has a total gross annual income of $29,952 and that her monthly expenses were between $700 and $800 per month. Plaintiff adds that defendant's testimony showed that he has approximately $40,000 in equity in the marital home and $15,939.12 in an account. According to plaintiff, defendant also acknowledged that he withdrew $6,000 from a joint account to pay his attorney fees incurred while the case was pending for trial, while she only withdrew $2,900 from the account to pay her attorney's retainer fee and the $400 mediator fee. Additionally, plaintiff asserts that her expenses would increase once the divorce was finalized because she would then be responsible for insurance as well as housing (which she estimated would be between $850 and $1,400 each month), utility, food, and clothing expenses.

Plaintiff sought an award of attorney fees under MCR 3.206(D), which provides:

> (1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

> (2) A party who requests attorney fees and expenses must allege facts sufficient to show that:

> (a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay, or

> (b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

Plaintiff argued that both subrules (D)(2)(a) and (b) applied, and requested that defendant pay 75% of the attorney fees she incurred after her retainer fee was expended. The circuit court's award of attorney fees was based on MCR 3.206(D)(2)(a). The court found that as of one week before trial, plaintiff had an outstanding attorney fee balance of $5,091.45. Defendant does not challenge this finding. The court concluded:

It is clear from the evidence of the parties' finances that [plaintiff] is unable to bear the expense of her attorney fees without incurring substantial debt and [defendant] has the ability to pay a portion of said attorney fees. In this case, [defendant] earns $97,162.70 compared to [plaintiff's] earnings of $29,952.00. After consideration of the parties' financial situation and the equities involved, the Court does find that an award of attorney fees is appropriate pursuant to MCR 3.206(D)(2)(a). The Court does not find that an award of attorney fees is appropriate pursuant to MCR 3.206(D)(2)(b).

Contrary to defendant's argument, caselaw has recognized that a court's award of attorney fees based on the "substantial disparity in the parties' incomes" does not constitute an abuse of discretion. *Voukatidis v Voukatidis*, 195 Mich App 338, 339; 489 NW2d 512 (1992). In any event, defendant has failed to establish that the circuit court's analysis was faulty.

As is permissible for a bench trial, the circuit court's analysis was succinct and unencumbered by an elaborate detailing of the parties' comparative financial resources and obligations. MCR 2.517(A)(2). The court did identify the disparity in the parties' yearly incomes, but it also broadly stated that it had considered the parties' specific financial situations and the equities of their particular circumstances.

Moreover, the evidence presented to the circuit court regarding income and expenses supports the award. Plaintiff estimated her monthly income is $2,473 and her monthly expenses are $800. She agreed this left her with a monthly surplus of $1,673. Defendant agreed that his 2022 W-2 indicates he had Medicare wages of $97,162.70 and $84,617.40 in wages, tips, and other compensation.[3] Defendant testified his monthly expenses included: (1) a $1,579.69 mortgage payment; (2) an $84.99 Internet payment; (3) a $72.32 cellular phone payment; (4) a $127.80 cable TV payment; (5) a $7.99 payment for media streaming; and (6) a $120 car insurance payment. Additionally, defendant agreed $201.58 was withdrawn from a bank account on September 9, 2023, to pay a monthly utility bill. He testified twice a year he paid the utility a prorated payment that is much higher. He also paid $701 monthly for child support and $250 for spousal support. His spousal support payments end after he has paid plaintiff a total of $4,500.

Using the amount of income defendant reported for federal income tax purposes ($84,617.40) and his total monthly expenses and support payments, this leaves him with a monthly surplus significantly higher than the $500 he claims. Moreover, defendant did not provide any testimony or documentation below explaining how he came up with a $500 surplus, nor has he provided an explanation on appeal.

Defendant's argument also ignores plaintiff's testimony about wanting to move out of her parents' basement and into housing in Tecumseh, which she determined will cost between $850 and $1,400 each month. And, even if she was able to find housing for $850 each month, that

---

[3] Medicare wages and tips are reported in box 5 of the W-2 form. That amount is used for Medicare tax purposes. Wages, tips, and other compensation are report in box 1 of the W-2 form. That amount is used for federal income tax purposes.

would reduce her monthly disposable income to $823, which she would need to pay for utilities, food, clothing, and other expenses she does not pay while living with her parents. The court did not clearly err or abuse its discretion when it ordered defendant to pay $5,000 to cover plaintiff's attorney fees.

Affirmed.

/s/ Stephen L. Borrello
/s/ Christopher M. Murray
/s/ Anica Letica